UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CHRISTOPHER P. MULVEY,

                        Plaintiff,

        v.

NASSAU UNIVERSITY MEDICAL CENTER,
et al.,

                       Defendants.

-----------------------------------------------------------------X

**MEMORANDUM AND
ORDER**
23-CV-8855-SJB-LGD

**BULSARA, United States District Judge:**

     Plaintiff Christopher P. Mulvey ("Mulvey") filed this pro se action against

Nassau University Medical Center ("NUMC"), Dr. Aanchal Sharma, and Dr. Leena

Mohan (collectively, "Defendants"), asserting claims for violations of his Fourteenth

Amendment, Fourth Amendment, and First Amendment rights pursuant to 42 U.S.C.

§ 1983, violations of the Health Insurance Portability and Accountability Act

("HIPAA"), and for theft of his personal property.  (Compl. dated Nov. 30, 2023, Dkt.

No. 1 at 4, 7).  The case arises out of Mulvey's involuntary psychiatric hospitalization at

NUMC in July 2023.  (*Id.* at 7–8).  Defendants have moved for summary judgment on all

of Mulvey's claims.  (Defs.' Mot. for Summ. J. dated May 7, 2025 ("Defs.' Mot."), Dkt.

No. 31-1).  For the reasons explained below, Defendants' motion for summary judgment

is granted in part and denied in part.

<u>LEGAL STANDARD</u>

     A "court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways. Fed. R. Civ. P. 56(c)(1). It may cite to portions of the record "including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials." *Id.* R. 56(c)(1)(A). Alternatively, it may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* R. 56(c)(1)(B); *cf. Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).

In moving for summary judgment or answering such a motion, litigants are required by the Local Rules to provide a statement (a Rule 56.1 statement) setting forth purported undisputed facts or, if controverting any fact, responding to each assertion. *See* Loc. Civ. R. 56.1(a)–(b). In both instances, the party must support its position by citing to admissible evidence from the record. *Id.* R. 56.1(d); *see also* Fed. R. Civ. P. 56(c)

(requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

Where claims in opposing Rule 56.1 statements are "genuinely disputed," the Court will consider the evidentiary sources of the claims. *Halberg v. United Behav. Health*, 408 F. Supp. 3d 118, 146 (E.D.N.Y. 2019) (adopting report and recommendation). In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court cannot—as is true for the summary judgment motion as a whole—weigh evidence or assess the credibility of witnesses. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). Furthermore, "[l]egal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded." *Taveras v. HRV Mgmt., Inc.*, No. 17-CV-5211, 2020 WL 1501777, at *2 (E.D.N.Y. Mar. 24, 2020); *Lawrence v. Cont'l Cas. Co.*, No. 12-CV-412, 2013 WL 4458755, at *1 n.1 (E.D.N.Y. Aug. 16, 2013) ("Both parties have submitted Local Rule 56.1 statements and responses to each other's statements that mix factual assertions with legal argument and therefore fail to meet the requirements of Local Rule 56.1. The facts . . . are taken from those assertions contained in the Local Rule 56.1 statements that comply with Local Rule 56.1[.]" (citations omitted)). The court may not grant summary judgment based on a fact in a Rule 56.1 statement—even if undisputed—not supported by admissible evidence. *E.g., Giannullo v. City of New York*, 322 F.3d 139, 142–43 (2d Cir.

2003) (vacating grant of summary judgment to defendants based on facts enumerated in Rule 56.1 statement supported only by arguments in briefs rather than admissible evidence).

The Court must also disregard conclusory denials that lack citations to admissible evidence. *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("*Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions[.]*"), *aff'd*, 56 F. App'x 27, 29 (2d Cir. 2003). Also, where the opposing party fails to specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party "will be deemed to be admitted." Loc. Civ. R. 56.1(c). The Court also does not give any consideration to hearsay, speculation, or inadmissible evidence in evaluating declarations or affidavits. *Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010) ("[A] court is obliged not to consider inadmissible evidence at the summary judgment stage[.]"); *Crawford v. Dep't of Investigation*, No. 05-CV-5368, 2007 WL 2850512, at *2 (S.D.N.Y. Oct. 1, 2007) ("[A] non-moving party 'must set forth specific facts showing that there is a genuine issue for trial;' he or she 'may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.'" (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005))), *aff'd*, 324 F. App'x 139, 143 (2d Cir. 2009).

In evaluating a motion for summary judgment against a pro se litigant, the Court construes the submissions of the pro se litigant liberally and interprets them "to raise

4

the strongest arguments that they suggest." *Williams v. Annucci*, 895 F.3d 180, 187 (2d

Cir. 2018) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d. 471, 474 (2d Cir. 2006)).

Nonetheless, proceeding pro se "does not relieve plaintiff of his duty to meet the

requirements necessary to defeat a motion for summary judgment." *Jorgensen v.

Epic/Sony Recs.*, 351 F.3d 46, 50 (2d Cir. 2003) (quotation omitted); *Moore v. Shahine*, No.

21-0711, 2022 WL 2118945, at *2 (2d Cir. June 13, 2022) ("Moore's *pro se* status in the

district court does not excuse her evidentiary failure.").

<u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

The Court finds the following facts—drawn from the pleadings, the parties'

respective Rule 56.1 statements, and supporting affidavits and exhibits attached

thereto—are undisputed unless otherwise noted.[1]

On July 25, 2023, Mulvey was brought to the NUMC emergency room by Officer

Rivera of the Nassau County Police Department ("NCPD"), following a 911 call

reporting that Mulvey was causing a disturbance by the pool at the park in

Syosset/Woodbury.  (Defs.' Rule 56.1 Statement dated May 7, 2025 ("Defs.' 56.1 Stmt."),

---

[1] Both parties Rule 56.1 statements are deficient.  Defendants' Rule 56.1 Statement fails to include material facts necessary to assess the pending motion—for example, it states only that Mulvey "was evaluated" by Dr. Sharma and Dr. Mohan.  (Defs.' Rule 56.1 Statement dated May 7, 2025 ("Defs.' 56.1 Stmt."), Dkt. No. 31-2 ¶¶ 25, 26).  It provides no facts about the evaluations, or any of the behaviors Mulvey displayed when evaluated, and therefore no basis on which to assess whether Defendants complied with the requirements of New York Mental Hygiene Law § 9.39 or the generally accepted standard of care.  Mulvey's Rule 56.1 Statement is also deficient, providing no citations to evidence from the record.  (*See* Pl.'s Rule 56.1 Statement dated May 26, 2025 ("Pl.'s Rule 56.1 Stmt."), Dkt. No. 32-5).  Nonetheless, the Court "has broad discretion to determine whether to overlook a party's failure to comply with local court rules," and conduct an "assiduous review of the record," *see Holtz*, 258 F.3d at 73 (quotation omitted), as it has done here.

Dkt. No. 31-2 ¶¶ 1, 5; Pl.'s Rule 56.1 Statement dated May 26, 2025 ("Pl.'s 56.1 Stmt."), Dkt. No. 32-5 ¶¶ 1, 5; NCPD Records, attached to Defs.' Mot as Ex. G, Dkt. No. 31-11 at 4). Park staff indicated that Mulvey was touching himself inappropriately in front of children. (Defs.' 56.1 Stmt. ¶ 4; Pl.'s 56.1 Stmt. ¶ 4; Mulvey's Medical Chart Part I, attached to Defs.' Mot. as Ex. D, Dkt. No 31-7 at 5). And NCPD EMS reported that when they arrived, Mulvey appeared confused, was covered in sunscreen, and had trouble answering simple questions. (Defs.' 56.1 Stmt. ¶ 6; Mulvey's Medical Chart Part I at 5, 37).

Mulvey was taken to the NUMC emergency room that day, where he was evaluated by Dr. Sharma. (Defs.' 56.1 Stmt. ¶ 25; Pl.'s 56.1 Stmt. ¶ 25). Dr. Sharma found that Mulvey was "disorganized in thought process" and "appear[ed] perplexed with a flat affect." (Mulvey's Medical Chart Part I at 37). He "responded to all questions with a different answer illogical in nature and overall was not able to follow a logical conversation," and he "[a]ppear[ed] grossly paranoid." (*Id.*). Dr. Sharma also noted that Mulvey had received prior outpatient psychiatric care, (*id.* at 38), and that while he had some suicide risk factors, including "out-patient treatment failure" and "refusing services," he ultimately posed a low risk for self-harm, (*id.* at 40). That said, Dr. Sharma also diagnosed Mulvey with schizophrenia and determined that his psychosis was a risk factor for violence. (*Id.*). Consequently, Mulvey posed a "high" risk for harm to others, and "display[ed] risks that require[d] inpatient hospitalization." (*Id.*). Determining that it was "not [] safe" to discharge Mulvey back into the

community, Dr. Sharma decided to admit him to the psychiatric unit. (Mulvey's Medical Chart Part I at 40).

While Mulvey was in the emergency room awaiting admission, a social worker spoke to Mulvey's mother. (*Id.* at 123). The social worker's notes from the phone call report, among other things, that Mulvey's mother and his father have tried to get Mulvey treatment but he refuses, that Mulvey's brother had bipolar disorder, and that there was an incident at the local library a few months earlier where Mulvey was acting bizarre and police were called. (*Id.*). A member of the inpatient psychiatric unit also spoke to Mulvey's mother, who said that Mulvey's grandparents had a history of depression and bipolar disorder, and his cousin died by suicide. (*Id.* at 124).

Following Mulvey's admission to the psychiatric unit he was evaluated by Dr. Mohan, an attending psychiatrist at NUMC, on July 27, 2023. (Defs.' 56.1 Stmt ¶ 26; Pl.'s 56.1 Stmt. ¶ 26; Affirmation of Dr. Leena Mohan ("Mohan Aff."), attached to Defs.' Mot. as Ex. I, Dkt. No. 31-13 ¶¶ 1, 27). Dr. Mohan found that Mulvey was "fidgety, with psychomotor hyperactivity" and was "touching [his] face all throughout conversation." (Mulvey's Medical Chart Part I at 74). Mulvey was "constantly scanning the room" and "appear[ed] to be internally preoccupied." (*Id.*). During the evaluation, Mulvey asked the interviewers what their thoughts were on "universal consciousness" and if "the mind is everything," and he "was often unable to finish his thoughts and derailed without conclusion, requiring repeated redirection." (*Id.*). Mulvey had been "seen walking on the unit in disorganized behavior, mumbling to [him]self." (*Id.* at 75). Like Dr. Sharma, Dr. Mohan noted Mulvey's prior psychiatric

7

treatment, and added that that he had stopped taking his medications. (*Id.*). Dr. Mohan noted that Mulvey's mental illness was a risk factor for suicide, and that his psychosis was a risk factor for violence. (*Id.* at 80). Ultimately, although Mulvey "denie[d] suicidal ideation" and "denie[d] any paranoia, auditory or visual hallucinations," Dr. Mohan found that he was "internally preoccupied" and "paranoid with disorganized behavior," warranting "inpatient psychiatric hospitalization and stabilization." (Mulvey's Medical Chart Part I at 80). Mulvey was kept at NUMC for observation and treatment until he was discharged on August 2, 2023. (Defs.' 56.1 Stmt. ¶ 27; Pl.'s 56.1 Stmt. ¶ 27).

The parties' factual disputes center around Mulvey's behavior at the park, what Mulvey's mother told hospital personnel, and Mulvey's medical and family history. Mulvey denies many of the facts asserted in Defendants' Rule 56.1 Statement, albeit without citation to record evidence. To start, Mulvey denies that he was causing a disturbance at the park and denies that he was touching himself inappropriately. (Pl.'s 56.1 Stmt. ¶¶ 1, 4). He contends that he was checking a chronically swollen lymph node, which he informed EMS about. (*Id.* ¶ 4). Mulvey also denies that he was disoriented or had trouble answering questions. (*Id.* ¶ 6). While Mulvey admits his mother was contacted by the hospital, he denies the accuracy of her purported statements, contending that the statements "seem to be misconstrued and embellished to support the hospital's narrative." (*Id.* ¶ 15). Specifically, he denies that his mother told the hospital he was "paranoid or bizarre" at home. (*Id.* ¶ 19). As to his medical and family history, Mulvey denies any documented diagnosis of bipolar disorder or

8

psychosis that justified emergency psychiatric intervention. (*Id.* ¶ 7). He denies having stopped taking his medications by himself and contends that the decision to taper off and discontinue medication was made in collaboration with and supervised by his doctor. (Pl.'s 56.1 Stmt. ¶ 8). He further denies that he withdrew or behaved bizarrely in his late teens or twenties, (*id.* ¶ 17), and denies that he ever refused needed treatment in adulthood, (*id.* ¶ 18). Lastly, Mulvey denies that he had a significant family history of psychiatric illnesses, (*id.* ¶ 13), and denies that his cousin's suicide was related to mental illness, (*id.* ¶ 14).

Mulvey filed this lawsuit on November 30, 2023. (Compl. at 1). In his Complaint, Mulvey asserts the following claims: (1) violation of his Fourteenth Amendment rights under § 1983, (2) violation of his Fourth Amendment rights under § 1983, (3) violation of his First Amendment rights under § 1983, (4) violation of HIPAA, and (5) theft. (*Id.* at 7). Defendants now seek summary judgment on all of Mulvey's claims. (Defs.' Mot. at 21).[2]

DISCUSSION

**I.    § 1983 Claims**

"To state a claim for relief in an action brought under § 1983, [Plaintiffs] must establish that [they were] deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Wheatley v. N.Y. State United Tchrs.*, 80 F.4th 386, 390 (2d Cir. 2023) (quoting *Am.*

---

[2] This case was reassigned from the Honorable Gary R. Brown to the undersigned on January 30, 2025.

*Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)).  Defendants do not contest that they are state actors.  And courts in this district have found that NUMC is a state actor for Section 1983 purposes.  *See, e.g., Leshore v. Comm'r of Long Beach P.D.*, No. 10-CV-6067, 2012 WL 1032643, at *7 n.4, n.5 (E.D.N.Y. Mar. 21, 2012); *McIntyre v. NuHealth–Nassau Univ. Med. Ctr.*, No. 11-CV-3934, 2011 WL 4434227, at *4 n.4 (E.D.N.Y. Sep. 19, 2011).  Therefore, the Court proceeds to analyze whether Defendants deprived Mulvey of any constitutional rights.

### A. Fourteenth Amendment Claims

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  "[W]hen the state curtails liberty through incarceration, *institutionalization, or other similar restraint of personal liberty* it trigger[s] the protections of the Due Process Clause." *J.M. v. Sessions*, 162 F.4th 364, 370–71 (2d Cir. 2025) (emphasis in original) (quotation omitted).  "An involuntary civil commitment is a massive curtailment of liberty, and it therefore cannot permissibly be accomplished without due process of law."  *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995) (quotation and citation omitted).  In involuntary commitment cases, "[d]ue process is violated if a commitment decision 'is made on the basis of substantive and procedural criteria that are substantially below the standards generally accepted in the medical community.'"  *Lurch v. Chaput*, No. 22-0798, 2023 WL 2469943, at *1 (2d Cir. Mar. 13, 2023) (quoting *Bolmer v. Oliveira*, 594 F.3d 134, 142 (2d Cir. 2010)).

The Second Circuit has held that the standards set forth for involuntary hospitalization in New York Mental Hygiene Law § 9.39 ("Section 9.39") satisfy the

10

requirements of both procedural and substantive due process. *See Project Release v. Prevost*, 722 F.2d 960, 971 (2d Cir. 1983) ("[H]aving considered the New York M.H.L. in its entirety, our inquiry leads us to conclude that the statute does meet the minimum facial requirements of due process—both substantive and procedural."). Accordingly, if a plaintiff fails to "cite[] admissible evidence to create a genuine issue of material fact as to whether [a physician's] decision to involuntarily commit him contravened the MHL . . . summary judgment [is] appropriate[]." *Lurch*, 2023 WL 2469943, at *2 (following *Project Release*, 722 F.2d at 971–73).

Section 9.39 provides that "an individual is to be admitted involuntarily pursuant to that section 'only if a staff physician of the hospital upon examination of such person finds that such person qualifies under the requirements of this section.'" *Rodriguez*, 72 F.3d at 1062 (quoting N.Y. Mental Hyg. Law § 9.39(a)). "Section 9.39 requires not only that the individual be 'alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate,' but also, consistent with substantive due process, that the patient's alleged mental illness be 'likely to result in serious harm to himself or others.'" *Id.* (quoting N.Y. Mental Hyg. Law § 9.39(a)). "Likelihood to result in serious harm" means:

> 1. substantial risk of physical harm to themselves as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that they are dangerous to themself, or
>
> 2. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm, or
>
> 3. a substantial risk of physical harm to the person due to an inability or refusal, as a result of their mental illness, to provide for their own essential

11

needs such as food, clothing, necessary medical care, personal safety, or shelter.

N.Y. Mental Hyg. Law § 9.39(a)(1)–(3).  To retain an individual for longer than 48 hours, the admitting physician's assessment must be "confirmed after examination by another physician [who is] a member of the psychiatric staff of the hospital."  *Id.* § 9.39(a).

Construing Mulvey's submissions liberally, Mulvey asserts violations of both his procedural and substantive due process rights.

### i.        Procedural Due Process

To determine whether Defendants violated Mulvey's procedural due process rights, the Court assesses whether Defendants complied with the procedural requirements of Section 9.39 when admitting Mulvey to NUMC.  *See Project Release*, 722 F.2d at 971; *Lurch*, 2023 WL 2469943, at *2.

Mulvey contends that Defendants violated his procedural due process rights by (1) holding him for 36 hours in the emergency room before transferring him to a room on the main psychiatric floor, (2) depriving him of his personal property, (3) failing to comply with Section 9.39's requirement that he be independently assessed by another physician on the psychiatric staff within 48 hours of his admission, and (4) not providing him an explanation of the basis for his hospitalization.  (Compl. at 8; Pl.'s Opp'n to Defs.' Mot. for Summ. J. dated May 26, 2025 ("Pl.'s Opp'n"), Dkt. No. 32 at 2; Aff. of Christopher P. Mulvey dated May 26, 2025 ("Mulvey Aff."), attached to Pl.'s Opp'n as Ex. 1, Dkt. No. 32-2 ¶ 14).

As to Mulvey's first claim, Section 9.39 does not require Defendants to transfer an involuntarily admitted patient from the emergency room to a main floor within a

certain timeframe. Nothing in Section 9.39 or the Due Process Clause requires that once involuntarily hospitalized, a person has a right to a particular location in a hospital, as between the emergency room or a main floor, for example.

As for Mulvey's second claim based upon deprivation of his personal property, Section 9.39 does not require that an involuntarily admitted patient be afforded any process before the hospital may temporarily confiscate their property. And Section 9.39 establishes the extent of procedural due process in this context. *See Project Release*, 722 F.2d at 971; *Capellupo v. Nassau Health Care Corp.*, No. 06-CV-4922, 2009 WL 1705749, at *7 (E.D.N.Y. June 16, 2009) ("[I]f defendants' actions comported with the strictures of the New York Mental Hygiene Law, they also satisfied the requirements of procedural due process."). Because Section 9.39 does not afford Mulvey any procedural due process rights with respect to a temporary seizure of property during his involuntary hospitalization, this claim must be dismissed. *Cf. Mawhirt v. Ahmed*, 8 F. App'x 125, 126–27 (2d Cir. 2001) (concluding that plaintiff's procedural due process rights were not violated "when [officers] transported him to [the hospital] . . . because he was not entitled to a hearing before being taken to a hospital or psychiatric emergency program" under the Mental Hygiene Law).

As to Mulvey's third claim, that Defendants failed to comply with Section 9.39's requirement that he be independently assessed by another physician on the psychiatric staff within 48 hours of his admission, Mulvey offers no evidence to support this allegation, and the Court finds none. Mulvey does not dispute that he was evaluated by both Dr. Sharma and Dr. Mohan. (Pl.'s 56.1 Stmt. ¶¶ 25–26). Mulvey's hospital

13

records indicate that he was initially evaluated by Dr. Sharma in the emergency room on July 25, 2023, and then evaluated by Dr. Mohan, an attending psychiatrist at NUMC, on July 27, 2023, within 48 hours of his admission.[3]  (Mohan Aff. ¶¶ 1, 24, 27).

As for his fourth claim about not being provided an explanation of the basis for his hospitalization, Mulvey has raised a sufficient fact issue to survive summary judgment.  Mulvey contends that: (1) he was "never told any specific reason or criteria [he] met for being held [at NUMC]," (Compl. at 8); (2) "[n]o clear explanation or review of the basis for detention was provided," (Pl.'s Opp'n at 2); (3) "Dr. Sharma never told [him] the specific reason for [his] detention," (Mulvey Aff. ¶ 10); (4) "no specific threat assessment or justification for [his] retention was ever explained to [him]," (*id.* ¶ 11); and (5) "[a]t no time was [he] ever advised that two independent physicians determined that [he] met the statutory requirements for involuntary commitment as required under MHL §9.39," (*id.* ¶ 14).  This assertion is consistently made, and goes unaddressed by Defendants.

Section 9.39 requires that a patient involuntarily admitted "be served, at the time of admission, with written notice of their status and rights as a patient under this section."  N.Y. Mental Hyg. Law § 9.39(a).  Mulvey's allegations that he was never informed of the basis for his hospitalization suggest that he may not have received the

---

[3] Though the precise amount of time between Mulvey's admission and Dr. Mohan's evaluation is unclear, Dr. Mohan stated in her Affidavit that it was within 48 hours of his admission.  (Mohan Aff. ¶ 27).  Mulvey does not offer any evidence to the contrary.  Though Mulvey contends in his Complaint that Defendants failed to have two doctors independently assess him "upon initial admittance," (Compl. at 8), that is not the relevant requirement.  Examination by a second physician is only required to retain an individual for longer than 48 hours.  *See* N.Y. Mental Hyg. Law § 9.39(a).

14

required "notice of [his] status and rights as a patient" under Section 9.39.  While Defendants generally contend that they "complied with the Mental Hygiene Law," (*e.g.*, Defs.' Mot. at 15), none of their papers say that Mulvey was provided with the written notice required by Section 9.39.  And no evidence in the record confirms Mulvey was given this notice.[4]  Because Section 9.39 sets the floor for procedural due process for patients admitted under that section, "it is paramount for [] physicians to strictly adhere to [its] provisions."  *People ex rel. Neville v. Linder*, 81 Misc. 3d 802, 811 (N.Y. Sup. Ct. 2023).  While Section 9.39 may not require an elaborate explanation of Mulvey's diagnoses, it requires at a minimum that Mulvey be given written notice of his status and rights as a Section 9.39 patient at the time of his admission.  Because the purpose of the notice is to allow a patient to challenge their involuntary hospitalization, the notice of a patient's "status" must include some minimal explanation as to the basis for their detention—i.e., informing them that they are being detained based on Section 9.39 because a physician concluded they posed a danger to themselves or others.  *See Vitek v. Jones*, 445 U.S. 480, 496 (1980) ("[N]otice is essential to afford the prisoner [who was being transferred involuntarily to a mental hospital] an opportunity to challenge the contemplated action and to understand the nature of what is happening to him.").

---

[4] The record contains only passing statements in medical providers' notes that Mulvey "was provided information to contact Mental health Legal Services," (Mulvey's Medical Chart Part I at 126), and informed about the criteria for psychiatric admission "by multiple members of the treatment team," (*id.* at 130).  Mulvey's Chart also reflects that he requested a hearing on July 29, 2023.  (*Id.* at 50).  These passing indications that Mulvey may have received some notice at some point are insufficient to establish that Mulvey was given written notice *at the time of his admission*, as the statute, and due process, requires.

Failure to provide a patient Section 9.39's required written notice at the time of admission violates procedural due process.  On this record, there is a genuine issue of material fact as to whether Defendants ever provided Mulvey the required notice, so summary judgment is inappropriate.  *See, e.g.*, *Ruhlmann v. Ulster Cnty. Dep't of Soc. Servs.*, 234 F. Supp. 2d 140, 172–73 (N.D.N.Y. 2002) (denying summary judgment where fact issues prevented the court from determining whether plaintiff received the notice at the time of his admission).

Defendants also seek summary judgment for Dr. Sharma and Dr. Mohan based on qualified immunity in a global, cursory way.  (Defs.' Mot. at 17–18).  "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Baltas v. Chapdelaine*, 153 F.4th 328, 335 (2d Cir. 2025) (quotation omitted).  "Even if an officer violated a plaintiff's clearly established rights, he 'will still be entitled to qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights.'"  *Id.* (quoting *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018)).  "The Second Circuit has made clear that defendants bear the burden of 'adequately develop[ing]' and 'proving' a qualified immunity defense."  *Soley v. County of Nassau*, No. 18-CV-0377, 2024 WL 1494383, at *16 (E.D.N.Y. Mar. 4, 2024) (quoting *Blissett v. Coughlin*, 66 F.3d 531, 538 (2d Cir. 1995)).  Defendants do not argue that Mulvey's right to notice under Section 9.39 was not clearly established, and they present no evidence here—because they essentially ignore the notice claim entirely—that their failure to give

the notice was based on an objectively reasonable belief. *See Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) ("A contention that—notwithstanding a clear delineation of the rights and duties of the respective parties at the time of the acts complained of—it was objectively reasonable for the official to believe that his acts did not violate those rights has its principal focus on the particular facts of the case." (quotation omitted)). Defendants cannot prevail on a defense for which they provide no facts: the record is too bare to determine summary judgment, even on qualified immunity grounds, for a claim that is unaddressed by Defendants. *E.g.*, *Soley*, 2024 WL 1494383, at *16 (denying qualified immunity at summary judgment where "defendants [did] not even *address* plaintiff's fair trial and speedy trial claims in their briefing on qualified immunity, much less 'develop' or 'prove' an argument for immunity").

Separately, Defendants contend that NUMC, as a public benefit corporation, cannot be held liable because Mulvey has not alleged that any violation of his rights resulted from an official policy, custom, or practice of NUMC. (Defs.' Mot. at 18–19). Public benefit corporations like NUMC are treated as municipalities for Section 1983 purposes, *Leshore*, 2012 WL 1032643, at *7 n.5 (collecting cases), and are only liable "if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality," *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). Mulvey has not pled sufficient facts to suggest that any violation of his constitutional rights was due to a custom or policy of NUMC. Accordingly, the Court grants summary judgment to NUMC on Mulvey's procedural due process claim.

17

In sum, the Court grants Defendants' motion for summary judgment on Mulvey's first three procedural due process claims.  With respect to Mulvey's fourth procedural due process claim, the Court grants summary judgment for NUMC, and denies summary judgment as to Defendants Sharma and Mohan.

### ii.    Substantive Due Process

"As a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others[.]" *Rodriguez*, 72 F.3d at 1061.  "[D]ue process . . . demand[s] that the decision to order an involuntary emergency commitment be made in accordance with a standard that promises some reasonable degree of accuracy."  *Id.* at 1062.  Therefore, "due process is satisfied if the defendants acted in accordance with generally accepted medical practices."  *Hogan v. A.O. Fox Mem'l Hosp.*, 346 F. App'x 627, 630 (2d Cir. 2009); *see also Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir. 1996) ("[A] doctor will not be liable under § 1983 for the treatment decisions she makes unless such decisions are such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment." (quotation omitted)).

"A doctor's decision to commit a person involuntarily under section 9.39 does not ordinarily involve matters within the layman's realm of knowledge."  *Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 190 (2d Cir. 2005) (quotation omitted).  The decision is "based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician," *id.* (quoting *Addington v. Texas*, 441 U.S. 418, 430 (1979)), and the determination of whether the decision violates due process

18

"turns on the *meaning* of the facts which [typically] must be interpreted by expert psychiatrists and psychologists," *see id.* at 191 (quoting *Addington*, 441 U.S. at 429). Therefore, without expert testimony as to generally accepted medical standards, "there [is] no legally sufficient evidentiary basis for a reasonable jury to find for [a plaintiff] on a claim that his involuntary commitment did not meet standards generally accepted in the medical community." *Id.* (quotations and citations omitted).  Accordingly, at summary judgment, "[t]he plaintiff bears the burden of producing competent evidence, typically in the form of expert testimony, regarding applicable medical standards and the defendants' alleged failure to meet those standards." *Kraft v. City of New York*, 696 F. Supp. 2d 403, 413 (S.D.N.Y. 2010), *aff'd*, 441 F. App'x 24 (2d Cir. 2011).  And "[i]n the absence of such evidence, summary judgment is appropriate." *Id.*; *see also Lurch*, 2023 WL 2469943, at *2 (affirming district court's grant of summary judgment where plaintiff "failed to produce any expert evidence in the district court to counter Defendants' expert's opinion, which explained that their conduct, under the circumstances, was consistent with generally accepted medical standards").

Mulvey contends that his condition was insufficiently serious to warrant involuntary admission, and Defendants violated his substantive due process rights by hospitalizing him involuntarily.  (Pl.'s Opp'n at 1–2).

To support their contention that they complied with Section 9.39 and generally accepted medical practices, Defendants have offered the expert testimony of Dr. Steven Fayer, Mulvey's records from NUMC, and affirmations from Dr. Sharma and Dr. Mohan.  (Affirmation of Dr. Steven Fayer ("Fayer Aff."), attached to Defs.' Mot. as Ex. B,

19

Dkt. No 31-5; Mulvey's Medical Charts, attached to Defs.' Mot. as Ex. D, Dkt. Nos. 31-7, 31-8; Affirmation of Dr. Aanchal Sharma, attached to Defs.' Mot. as Ex. H, Dkt. No. 31-12; Mohan Aff.).  Dr. Fayer is a physician licensed to practice in the State of New York, and is board certified by the American Board of Psychiatry and Neurology.  (Fayer Aff. ¶ 1).  Based on his review of Mulvey's medical records, Mulvey's deposition testimony, NCPD records, and his experience as a board-certified physician in psychiatry, it is Dr. Fayer's opinion that Dr. Sharma and Dr. Mohan's decision to admit Mulvey to NUMC involuntarily and retain him for observation until August 2, 2023 was sufficiently justified, and did not deviate in any way from the standard of psychiatric care, because the requirements to involuntarily admit a patient under Section 9.39 were satisfied.  (*Id.* ¶¶ 3–4, 6–7, 49–50).

Dr. Fayer describes the generally accepted standards for involuntary admission as those outlined in Section 9.39, (*id.* ¶¶ 34–37), and explains that "[w]hen determining whether a specific patient requires involuntary admission to an inpatient facility, the primary threshold question is to determine whether or not a patient is at risk of harming themselves or others," (*id.* ¶ 41).  Dr. Fayer states that Dr. Sharma, Dr. Mohan, and other providers at NUMC "acted appropriately in evaluating [Mulvey], [and] conducted a thorough assessment and obtained a thorough history to determine whether [Mulvey] was a substantial risk of harm to himself or others."  (*Id.*).  Based on the information available to Dr. Sharma and Dr. Mohan from their investigations and evaluations—including Mulvey's "prior history of bipolar disorder and psychosis with prior treatment and noncompliance with medication," (*id.* ¶ 42); Mulvey's presentation

20

at NUMC with "paranoia, anxiety, disorganized [] thought process[es]" and his appearing "perplexed with a flat affect" and demonstrating "an inability to answer simple questions," (Fayer Aff. ¶ 42); Mulvey's "questionable sexual behavior" on the day he was transported from the park by police, (*id.*); and Mulvey's "family history of multiple relatives with psychological disorders resulting in the suicide of his cousin," (*id.* ¶ 44)—Dr. Fayer believes there was "a clear and convincing basis for the belief that [Mulvey] presented a substantial risk of harm to himself and others." (*Id.* ¶ 47). Therefore, in Dr. Fayer's opinion, Dr. Sharma and Dr. Mohan met the standard of care with respect to Mulvey's admission and met all applicable standards and guidelines for involuntary admission. (*Id.* ¶ 49).

In opposition, Mulvey submitted his own affidavit, as well as affidavits from each of his parents. (Mulvey Aff.; Aff. of Jean Mulvey dated May 26, 2025 ("Jean Mulvey Aff."), attached to Pl.'s Opp'n as Ex. 2, Dkt. No. 32-3; Aff. of John Mulvey dated

21

May 26, 2025, attached to Pl.'s Opp'n as Ex. 3, Dkt. No. 32-4).[5]  But critically, Mulvey submitted no expert testimony.[6]  Mulvey's failure to provide expert testimony setting forth the generally accepted medical standards and practices for involuntary commitment and explaining how Defendants failed to satisfy such standards is fatal to his substantive due process claim.  *See Olivier*, 398 F.3d at 191 ("Because Olivier did not introduce expert testimony as to medical standards, there [was] no legally sufficient evidentiary basis for a reasonable jury to find for Olivier, on a claim that his involuntary commitment did not meet standards generally accepted in the medical community."

---

[5] Mulvey also contends that Defendants' records indicate that he did not meet the standard for involuntary admission, noting that Defendants' own records regarding Mulvey state "[l]ow or no acute risk of harm to self," "[n]o suicidal ideation or history," "[n]o observed threats or acts of violence," "[a]lert and oriented behavior," and "[c]alm demeanor upon discharge."  (Pl.'s Opp'n at 1–2).  Mulvey does not cite to specific portions of his hospital records, but the Court has reviewed the records and concludes that the isolated instances to which Mulvey may be referring are insufficient to create a fact issue to defeat summary judgment.  Setting aside the fact that the records note some suicide risk factors for Mulvey, the fact that the records also indicate that Mulvey posed only a "[l]ow" risk of harm to himself and presented "no suicide risk" does not create a fact issue as Defendants' decision to admit Mulvey was primarily based on the "high" risk he posed to others, not himself.  (*See* Mulvey's Medical Chart Part I at 40).  The fact that the records indicate no observed threats or acts of violence is also insufficient to create a fact issue, as overt acts of violence are not required to justify admission under Section 9.39.  Dr. Sharma's evaluation states on a single page "alert and oriented to person, place, time/situation.  Normal mood and affect.  No apparent risk to self or others," under "Physical Exam," (Mulvey's Medical Chart Part I at 41), but the weight of the report says otherwise, (*see id.* at 37–40).  The Court finds this isolated notation is likely a scrivener's error given the remainder of the report and the end conclusions of Dr. Sharma.  And lastly, Mulvey's "calm demeanor upon discharge" is irrelevant to Defendants' decision to admit him in the first instance.

[6] While the Court recognizes retaining an expert may be more burdensome for a pro se litigant like Mulvey, proceeding pro se does not relieve Mulvey of his burden to produce expert testimony to survive summary judgment.  Defendants provided Mulvey with the required notice to pro se litigants under Local Civil Rule 56.2.  (*See* Defs.' Letter re Rule 56.2 Notice, Dkt. No. 44; Rule 56.2 Notice, Dkt. No. 44-1).

22

(quotations omitted));[7] *see, e.g.*, *Altamuro v. County of Nassau*, 33 F. App'x 556, 561 (2d Cir. 2002) ("Although in his testimony Altamuro disputed some of the factual events documented in his chart, he presented no evidence that the defendants' conduct fell substantially below generally accepted standards in the medical community."); *Aouatif v. City of New York*, No. 07-CV-1302, 2019 WL 2410450, at *9 (E.D.N.Y. May 31, 2019) (granting summary judgment where plaintiff provided no expert testimony to demonstrate admission violated accepted medical standards), *aff'd*, 811 F. App'x 711 (2d Cir. 2020). Because the evidence fails to establish a substantive due process violation by Dr. Sharma and Dr. Mohan in admitting Mulvey to NUMC, Defendants' motion for

---

[7] In the affidavits, Mulvey and his parents deny several of the facts that contributed to Defendants' decision to admit him to NUMC. For example, Mulvey denies that he was a danger to himself or others, (Mulvey Aff. ¶ 3), and denies having a history of mental illness or bizarre behavior in his early adulthood, (*id.* ¶ 15). And Mulvey's mother denies having told hospital personnel that Mulvey was behaving bizarrely in his late teens or twenties, (Jean Mulvey Aff. ¶ 6), and denies that their family has an extensive history of suicide or serious mental illness, (*id.* ¶ 9). Such conclusory denials of Mulvey's behavior and medical history are insufficient to defeat summary judgment. *See Kulak*, 88 F.3d at 76 ("Nothing in *Rodriguez* purports to hold that bare denials of statements allegedly made by patients under such circumstances is enough to defeat summary judgment."); *Katzman v. Khan*, 67 F. Supp. 2d 103, 111 (E.D.N.Y. 1999) (finding pro se plaintiff's "blanket denials of his bizarre behavior and bald assertions that his examining doctors fabricated their observations" insufficient to create a fact issue to survive summary judgment), *aff'd*, 242 F.3d 365 (2d Cir. 2000).

23

summary judgment on Mulvey's Section 1983 claim for violation of his substantive due process rights under the Fourteenth Amendment is granted.[8]

## B. Fourth Amendment Claim

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "This protection adheres whether the seizure is for purposes of law enforcement or due to an individual's mental illness." *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016). "[I]nvoluntary confinement to a hospital is 'tantamount to the infringement of being arrested,' and thus amounts to a seizure within the meaning of the Fourth Amendment." *Aouatif*, 2019 WL 2410450, at *9 (quoting *Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993)). "Probable cause is a complete defense to an unreasonable seizure claim, and, in the context of an involuntary hospitalization, it exists 'only if there are reasonable grounds for believing that the person seized is dangerous to h[im]self or to others.'" *Lurch*, 2023 WL 2469943, at *1 (citation omitted) (quoting *Anthony v. City of New York*, 339 F.3d 129, 137 (2d Cir. 2003)); *see also Accardi v. County of Suffolk*, No. 24-

---

[8] Defendants also seek summary judgment on Mulvey's substantive due process claim based on qualified immunity. Here, the qualified immunity analysis and the merits analysis merge into a single inquiry. Because the right to be free from involuntary confinement is clearly established, in the involuntary hospitalization context, "the availability of qualified immunity turns on whether it was objectively reasonable for the defendants to believe, at the time they examined [the patient] and in light of the information that they possessed, that [the patient] was dangerous." *Glass v. Mayas*, 984 F.2d 55, 57 (2d Cir. 1993). The merits analysis asks the same question, as "due process does not require a guarantee that a physician's assessment of the likelihood of serious harm be correct . . . [it] demand[s] that the decision to order an involuntary emergency commitment be made in accordance with a standard that promises some reasonable degree of accuracy." *Rodriguez*, 72 F.3d at 1062.

24

0903, 2025 WL 88281, at *2 (2d Cir. Jan. 14, 2025) ("[A]n involuntary hospitalization may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard." (quoting *Glass*, 984 F.3d at 58)).  The probable cause standard for an involuntary hospitalization is thus "closely related" to the substantive due process standard.  *Lurch*, 2023 WL 2469943, at *1.

Mulvey contends that his seizure violated the Fourth Amendment, but he primarily contests the actions of Nassau County Police Officer Rivera, who is not a defendant.  (*See* Pl.'s Opp'n at 2).  To the extent that Mulvey asserts a Fourth Amendment claim against NUMC, Dr. Sharma, or Dr. Mohan arising out of his forced hospitalization, this claim fails for the largely the same reasons Mulvey's Fourteenth Amendment substantive due process claim fails.  The evidence in the record—including the expert testimony of Dr. Fayer—indicates that Dr. Sharma and Dr. Mohan had reasonable grounds to believe that Mulvey posed a danger to himself or others necessitating his admission to NUMC for observation and treatment.  *See supra* pp. 19–21.  Therefore, Dr. Sharma and Dr. Mohan's decision to admit Mulvey to NUMC was supported by probable cause and did not violate the Fourth Amendment.  *See, e.g.*, *Capellupo*, 2009 WL 1705749, at *12 ("[T]he undisputed facts demonstrate that both examining physicians had reasonable grounds, within the parameters of generally accepted medical standards, for their determination that plaintiff posed a threat either to himself or others.  Therefore, defendants had probable cause to seize plaintiff and his involuntary commitment did not violate the Fourth Amendment.").  Accordingly,

Defendants' motion for summary judgment on Mulvey's Section 1983 claim for violation of the Fourth Amendment is granted.

### C. First Amendment Claim

Mulvey also generally asserts that Defendants violated his First Amendment rights to "free speech, expression, assembly, and liberty." (Compl. at 4; Pl.'s Opp'n at 1). Mulvey does not elaborate on this allegation in any of his papers, and even construing Mulvey's submissions liberally, the Court finds no facts to support a First Amendment violation.[9] Accordingly, Defendants' motion for summary judgment on Mulvey's First Amendment claim is granted.

## II.    HIPAA

Mulvey's Complaint also asserts a claim for violation of HIPAA, contending that Defendants failed to provide him with his medical records. (Compl. at 7, 9). Neither of the parties address this claim in their motion papers. While Defendants did not move for summary judgment on this claim, the Court has the power to dismiss this claim as frivolous sua sponte. *See Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000). Because there is no private right of action under HIPAA, *see Meadows v. United Servs., Inc.*, 963 F.3d 240, 244 (2d Cir. 2020), the Court dismisses this claim.

---

[9] Having found that Dr. Sharma and Dr. Mohan did not violate Mulvey's substantive due process, Fourth Amendment, or First Amendment rights in admitting him to NUMC, there is no basis to hold NUMC liable under Section 1983 on these claims, and they are also dismissed. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").

**III.    Theft**

Mulvey's Complaint also asserts that Defendants committed theft.  (Compl. at 7–8).  He alleges that when he was released, Defendants did not return approximately $ 450 worth of his personal belongings, including his clothes and shoes.  (*Id.* at 8).  Mulvey does not defend this claim in his opposition to Defendants' motion for summary judgment, and he testified at his deposition "[t]he basic gist is the property was returned."  (Dep. of Christopher P. Mulvey, attached to Defs.' Mot. as Ex. E, Dkt. No. 31-9 at 114:18-19).  The claim appears to be moot and abandoned.  Accordingly, Defendants' motion for summary judgment on Mulvey's theft claim is granted.

CONCLUSION

For the reasons explained above, Defendants' motion for summary judgment is granted in part and denied in part.  The Court grants Defendants' motion for summary judgment on Mulvey's claims for violations of the Fourth Amendment, First Amendment, and HIPAA, as well as Mulvey's theft claim and claim for violation of his substantive due process rights under the Fourteenth Amendment.  The Court dismisses these claims with prejudice.

As to Mulvey's claims that Defendants violated his procedural due process rights under the Fourteenth Amendment, the Court grants Defendants' motion for summary judgment on Mulvey's first three claims—in which Mulvey contends that Defendants violated his procedural due process rights by (1) holding him for 36 hours in the emergency room before transferring him to a room on the main psychiatric floor, (2) depriving him of his personal property, and (3) failing to comply with Section 9.39's

27

requirement that he be independently assessed by another physician on the psychiatric staff within 48 hours of his admission—and dismisses these claims with prejudice. On Mulvey's remaining claim that Defendants violated his procedural due process rights by failing to provide him notice of his status and rights as a patient at the time of his admission, the Court grants summary judgment to NUMC. However, the Court denies summary judgment on this claim as to Defendants Sharma and Mohan. Because all claims against NUMC are dismissed, the Clerk of Court is respectfully directed to remove NUMC from the docket. The remaining parties are directed to submit a joint proposed pretrial order by **March 30, 2026,** consistent with the undersigned's Individual Practices.

SO ORDERED.

*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge

Date:   February 27, 2026
        Central Islip, New York

28